# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| 3M COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO.: N18C-07-089 AML CCLD |
| | ) | |
| NEOLOGY, INC. and ONE EQUITY | ) | |
| PARTNERS VI, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: March 25, 2019
Decided: June 28, 2019

**Upon Plaintiff's Motion to Dismiss Defendant Neology, Inc.'s First Amended
Counterclaim: Granted in Part, Denied in Part**

## MEMORANDUM OPINION

Rafael X. Zahralddin-Aravena, Esquire, Jonathan M. Stemerman, Esquire of
ELLIOTT GREENLEAF, P.C., Wilmington, Delaware, and Lawrence M. Shapiro,
Esquire, Sybil L. Dunlop, Esquire of GREENE ESPEL PLLP, Minneapolis,
Minnesota, *Attorneys for* Plaintiff.

Catherine A. Gaul, Esquire of ASHBY & GEDDES, Wilmington, Delaware, and
John D. Alessio, Esquire, Alex G. Brizolis, Esquire of PROCOPIO, CORY,
HARGREAVES & SAVITCH LLP, San Diego, California, *Attorneys for*
Defendant Neology, Inc.

T. Brad Davy, Esquire, Jonathan A. Choa, Esquire of POTTER ANDERSON &
CORROON LLP, Wilmington, Delaware, *Attorneys for* Defendant One Equity
Partners VI, L.P.

**LeGrow, J.**

In May 2017, Buyer purchased Seller's tolling and automated license plate recognition business, and the parties executed an asset purchase agreement governing the sale. To complete the transaction, the parties also entered into several transition agreements requiring Seller to assist Buyer in the transition of the business. Seller initiated this action against Buyer after a dispute arose during the transition period. Buyer answered and asserted several counterclaims against Seller for breach of contract, fraud in the inducement, fraudulent concealment, indemnification, and breach of the implied covenant of good faith and fair dealing. According to Buyer, Seller misrepresented and intentionally concealed a major design flaw of one of its key products to induce Buyer into purchasing the business. Additionally, Buyer alleges Seller failed to perform its contractual obligations under the transition agreements.

Currently before the Court is Seller's motion to dismiss Buyer's amended counterclaim for failure to state a claim. Seller has moved to dismiss the claims for procedural and substantive reasons, including that the claims are untimely under the contractual limitations period, fail to state a claim under the contract, and are contract claims masquerading as fraud claims. For the following reasons, I dismiss Buyer's implied covenant and breach of the asset purchase agreement counterclaims with prejudice and dismiss one of Buyer's breach of transition

1

agreement counterclaims without prejudice. Buyer's remaining causes of action survive under the minimal pleading standard applicable to a motion to dismiss.

## FACTS AND PROCEDURAL BACKGROUND

In 2017, 3M Company ("3M"), sold its tolling and automated license plate recognition ("ALPR") business (the "Business") to Defendant Neology, Inc. ("Neology"). Defendant One Equity Partners VI, L.P. acted as guarantor for Neology. The parties executed an Asset Purchase Agreement (the "APA") on May 4, 2017. As part of the transaction, 3M and Neology also entered into the Transition Distribution Services Agreement (the "Distribution Agreement"), the Transition Services Agreement (the "Service Agreement"), and the Transition Contract Manufacturing Agreement (the "Manufacturing Agreement") (collectively, the "Transition Agreements").

### The APA

The APA, which set forth the terms and conditions of 3M's sale of the Business to Neology, contains several provisions essential to the parties' dispute.

#### A. Representations and Warranties

Article 3 of the APA contains representations and warranties 3M made to Neology. In Section 3.5, 3M specifically represented and warranted that there had been no "Material Adverse Effect" to the Business between December 31, 2016 and May 4, 2017. The APA defines a Material Adverse Effect as:

[A]ny state of facts, circumstance, condition, event, change, development, occurrence or effect (each, an "Effect") that is materially adverse to (a) the business, condition (financial or otherwise), assets, liabilities, operations or results of operations of the Business, taken as a whole or (b) the ability of [3M] to perform its obligations under this [a]greement or to consummate the transactions contemplated hereby . . .[1]

The definition of a Material Adverse Effect, however, expressly excludes any effect that:

[R]elates to, arises out of or results from . . . (vii) any failure by the Business to meet any internal or external estimates, expectations, budgets, projections or forecasts (but the underlying causes of such failure may so constitute or be taken into account unless such underlying causes would otherwise be excepted by another clause of this definition) . . .[2]

Elsewhere in the APA, Neology expressly disclaimed reliance on any representations and warranties except those contained in Article 3 of the APA (the "Non-Reliance Clause").[3] Specifically, Neology agreed that:

[I]t has relied solely upon its own independent investigation, review and analysis, and reached its own independent conclusions regarding, the Business and its operations, assets, condition (financial or otherwise) and prospects and has not relied on and is not relying on any representation, warranty or other statement made by, on behalf of or relating to [3M], [3M]'s [a]ffiliates or the Business except for the representations and warranties expressly set forth in Article 3 . . .[4]

---

[1] 3M's Opening Br. Ex. A at 8 [hereinafter "APA"].
[2] APA at 8. The definition contains a number of other carve-outs in sections (b)(i)-(xi), but the carve-out in section (b)(vii) is most relevant to this dispute.
[3] *Id.* § 4.8.
[4] *Id.* § 4.8(a).

3

Neology agreed not to rely on any representations and warranties, except for those in Article 3, including any statements regarding "the operation or probable success or profitability of the Business" or "the accuracy or completeness of any information" made available to Neology in connection to the APA or in Neology's investigations of the Business.[5] Neology also disclaimed all rights and remedies arising out of any representation, warranty, or statement 3M made other than the representations and warranties expressly set forth in Article 3.[6]

## B. Covenants

Article 5 of the APA sets forth both parties' covenants. Section 5.1 required 3M to continue to conduct the Business in its ordinary course before the transaction closed. 3M specifically promised that before closing it would:

> [U]se commercially reasonable efforts to (A) operate the Business in the ordinary course of business, consistent with past practice . . . (B) maintain and preserve the present business organizations, assets and technology of the Business . . . and (C) maintain and preserve the relationships and goodwill with customers and suppliers of the Business.[7]

## C. Indemnification

Article 10 of the APA provides both parties the right to indemnification for certain losses. Under Section 10.2, 3M is obligated to indemnify Neology for any losses arising from an inaccurate representation or warranty in Article 3 or any

---

[5] *Id.* § 4.8(b).
[6] *Id.*
[7] *Id.* § 5.1.

breach of covenant, agreement, or obligation to be performed by 3M under the APA. Section 10.8(a) makes indemnification the parties' exclusive remedy (the "Exclusive Remedy Clause"), and provides:

> From and after the Closing, (i) this Article 10 shall be the sole and exclusive remedy of the [i]ndemnified [p]arties (including [Neology] and [3M]) in connection with this [a]greement and the transactions contemplated hereby, (ii) neither [Neology] nor [3M] shall be liable or responsible in any manner whatsoever (whether for indemnification or otherwise) to any [i]ndemnified [p]arty for a breach of this [a]greement or in connection with any of the transactions contemplated by this [a]greement . . . each [p]arty hereby waives, to the fullest extent permitted under applicable [l]aw, any and all rights, claims and causes of action (A) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or (B) otherwise relating to the subject matter of this [a]greement, in each case, that it may have against the other [p]arty . . .

Fraud claims, however, fall outside the Exclusive Remedy Clause, as Section 10.8(b) makes clear:

> Nothing in this Article 10, but subject in all cases to the limitations in Section 4.8 and Section 11.3, shall limit either [p]arty's right to bring a claim until the latest time permitted by applicable [l]aw based on the [f]raud of any other [p]erson against such [p]erson in respect of any representation and warranty contained in Article 3 or Article 4 . . .

The APA further sets certain limitations periods applicable to the APA's representations, warranties, and covenants. The representation in Section 3.5 expires eighteen months after the closing date.[8] All covenants and agreements that

---

[8] *Id.* § 10.1(a)(ii).

must be performed before the closing expire twelve months after the closing date.[9] In order to bring a timely claim, the complaining party must provide written notice within the survival period, including "a description in reasonable detail of (i) the basis for, and nature of, such Claim, including the facts constituting the basis for such Claim, and (ii) the estimated amount of the Losses that have been or may be sustained . . ."[10] Neither party is required to indemnify the other beyond the survival period, but if any claim is brought in good faith during the survival period, the claim survives until it is "fully and finally resolved."[11]

If a timely claim is brought, Section 10.5(b) limits 3M's liability for indemnification to Neology, stating: "the maximum aggregate [l]iability of [3M] (i) under Section 10.2(a) shall be $300,000, and (ii) under Section 10.2(a) and Section 10.2(b) together shall be the [p]urchase [p]rice." Section 10.2(a) refers to claims arising out of "any inaccuracy in any representation or warranty of [3M] contained in Article 3," and Section 10.2(b) refers to claims arising out of "any breach of any covenant, agreement or obligation to be performed by [3M] or any of its [a]ffiliates contained in or made pursuant to [the APA]."

To summarize, claims under the APA – other than for fraud – must be noticed within the survival period applicable to that claim, are limited to claims for

---

[9] *Id.* § 10.1(a)(iii).
[10] *Id.* § 10.6(a).
[11] *Id.* § 10.1(b).

indemnification, and any resulting damages award is capped at $300,000 in the case of inaccurate representations or warranties in Article 3, or at the purchase price in the case of a breach of any covenant.

**The Transition Agreements**

In addition to the APA, 3M and Neology also entered into the Transition Agreements. The Transition Agreements required 3M to perform certain services for Neology after the closing to assist with the transition of the Business. For example, the Service Agreement required 3M to provide Accounting and Finance Services, Information Technology Services, Supply Chain Services, and IT Systems Access Services.[12] In addition, under the Manufacturing Agreement, 3M agreed to manufacture and sell products.[13] The Distribution Agreement required 3M to sell products to customers and to accept and decline orders.[14] Each transition agreement contained a provision requiring 3M to perform these services for Neology with the same standard of care 3M would use for its own business.[15] Each transition agreement also contained a clause limiting 3M's liability to Neology for breach of the agreement. Specifically, 3M's maximum liability to Neology for breach of contract is $500,000 under the Distribution Agreement,[16]

---

[12] 3M's Opening Br. Ex. C App. A [hereinafter "Service Agreement"].
[13] 3M's Opening Br. Ex. D § 2.1 [hereinafter "Manufacturing Agreement"].
[14] 3M's Opening Br. Ex. B § 2.5 [hereinafter "Distribution Agreement"].
[15] Distribution Agreement § 2.3; Manufacturing Agreement § 2.5; Service Agreement § 2.4.
[16] Distribution Agreement § 4.1(a).

$600,000 under the Service Agreement,[17] and the total amount paid under the Manufacturing Agreement as of the date of the alleged breach.[18]

**This Litigation and Neology's Amended Counterclaims**

On July 11, 2018, following difficulties with the Business's transition, 3M brought this action against Neology and One Equity. Neology filed its answer along with counterclaims for breach of contract, fraud in the inducement, indemnification, and breach of the implied covenant of good faith and fair dealing. 3M moved to dismiss Neology's original counterclaims under Superior Court Civil Rule 12(b)(6), and Neology then filed amended counterclaims (the "Amended Counterclaims") containing additional breach of contract claims and a claim for fraudulent concealment. 3M again moved to dismiss and the parties briefed and argued that motion.

The Amended Counterclaims focus on two sets of allegations: (1) before selling the Business to Neology, 3M misrepresented and concealed product development issues with the Business's new fixed ALPR camera (the "New Fixed Camera"), and (2) during the transition period, 3M failed to maintain an exemption needed for Neology legally to sell ALPR products in the European Union, and 3M sold ALPR products at below average gross profit margins.

---

[17] Service Agreement § 4.1(a).
[18] Manufacturing Agreement § 7.2(a).

## A. The New Fixed Camera

Neology's first set of allegations concern undisclosed problems with the New Fixed Camera. Neology alleges that during due diligence, 3M provided several projections and forecasts for the Business that specifically referenced the New Fixed Camera. For example, a March 13, 2017 report by KPMG (the "KPMG Report") stated the Business would be launching the New Fixed Camera in mid-2017, "which would help drive and grow the ALPR gross margins."[19] The KPMG Report projected the New Fixed Camera "would account for 12.16% of the Business's fixed ALPR camera sales in 2017, 52.38% of the fixed camera sales in 2018, and 100% of the fixed camera sales in 2019."[20] An April 5, 2017 report by Ernst & Young LLP (the "E&Y Report") also noted that the Business was "focusing on developing new technology and not attempting to market/sell the aged technology."[21]

Despite these statements, Neology contends 3M knew the New Fixed Camera would not be ready to launch by mid-2017. Neology cites a March 16, 2017 3M internal report (the "Thermal Report") suggesting the New Fixed Camera "suffer[ed] from 'serious overheating' issues."[22] According to Neology, 3M's efforts to resolve these design issues proved unsuccessful, and Neology did not

---

[19] Am. Countercl. ¶ 7.
[20] *Id.* ¶ 8.
[21] *Id.* ¶ 7.
[22] *Id.* ¶ 10.

discover the New Fixed Camera's overheating problem until after it acquired the Business. Neology further claims that despite diligent attempts to redesign the New Fixed Camera, it has been unable to resolve the overheating issue and get the product to market.

Neology asserts several claims related to the overheating issue with the New Fixed Camera. First, Neology brings a breach of contract claim alleging the overheating issue was a "Material Adverse Effect" known to 3M as early as March 2017, and 3M therefore inaccurately represented and warranted in APA Section 3.5 that there had been no Material Adverse Effect to the Business since December 31, 2016. Neology also seeks indemnification for losses related to the inaccurate representation in Section 3.5. Next, Neology claims 3M's failure to disclose the camera's overheating issue was a violation of the APA's implied covenant of good faith and fair dealing. Finally, Neology claims 3M fraudulently induced Neology into purchasing the Business and intentionally and fraudulently concealed the Thermal Report.

## B. The RoHS 2 Exemption and Sale of ALPR Products

The Amended Counterclaims also describe 3M's alleged failures to perform as required during the transition period. Neology first claims 3M breached its obligation to maintain an exemption from the European Commission's Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic

10

Equipment (the "RoHS 2 Exemption"). The RoHS 2 Exemption is a permit the Business needs to sell certain ALPR products in the European Union.[23] According to Neology, 3M obtained the RoHS 2 Exemption when it owned the Business, but 3M allowed the exemption to expire in July 2017 after the sale of the Business was complete. This lapse allegedly left Neology unable legally to sell ALPR products in the European Union almost immediately after it purchased the Business.

Neology also alleges that during the transition period, 3M failed to sell ALPR products consistent with past practices, resulting in lower than normal gross profit margins. Neology specifically references the KPMG Report, which listed an average gross profit margin of "49.9% in 2014, 47.5% in 2015 and 28.9% in 2016" and reported "gross profit margin is expected to step-up from 29% in FY 2016 to a more normalized 41% in FY 2017, when compared to 48% gross margins achieved in FY 2015."[24] Despite this report, 3M sold ALPR products at an 8.45% gross profit margin during the transition period, and 3M continued to sell ALPR products at a gross profit margin of -396.54% after Neology terminated the Transition Agreements in November 2017.[25]

Neology cites 3M's transition period conduct to support several of its claims. Neology first alleges that by failing to maintain the RoHS 2 Exemption,

---

[23] At oral argument, the parties agreed the RoHS 2 Exemption was a "Permit" within the meaning of the APA and the Transition Agreements.
[24] Am. Countercl. ¶ 38.
[25] *Id.* ¶¶ 39-40.

11

3M breached its covenant in the APA to operate the Business before closing in the ordinary course and consistent with past practices. Neology also contends its losses related to the breach of covenant are subject indemnification. Neology offers similar allegations to support its claim for breach of the Transition Agreements. Neology alleges 3M was required to provide services consistent with 3M's past practices, but instead 3M failed to maintain the RoHS 2 Exemption and sold ALPR products at historically low gross margins. Finally, Neology contends this conduct supports its claim for breach of the APA's and the Transition Agreements' implied covenant of good faith and fair dealing.

**The Parties' Contentions**

In its motion to dismiss, 3M attacks the Amended Counterclaims as both procedurally and substantively deficient. 3M first argues Neology's claims are barred procedurally because Neology failed to follow contractually-mandated dispute resolution procedures, certain claims are untimely, and the original counterclaim improperly was amended under Superior Court Civil Rule 15(a). Next, 3M contends Neology's breach of contract claims under the APA must be dismissed because indemnification is the parties' exclusive remedy. As to Neology's indemnification claim, 3M argues that claim must be dismissed because Neology fails to plead the existence of a "Material Adverse Effect" as defined in the APA. Even if the indemnification claim survives, 3M contends the Court

should strike the request for damages in excess of $300,000. 3M also argues Neology's breach of contract claims under the Service Agreement and the Manufacturing Agreement must be dismissed because 3M was not obligated to maintain the RoHS 2 Exemption under those agreements. 3M contends the implied covenant claim should be dismissed because the express terms of the contract govern the conduct at issue. Finally, 3M argues the fraud claims impermissibly are bootstrapped to Neology's breach of contract claim and also are barred by the APA's Non-Reliance Clause.

In response, Neology first argues its counterclaims are not barred procedurally because the parties have satisfied or waived any pre-litigation dispute resolution requirements; Neology's claims timely were noticed; and under a pragmatic interpretation of Rule 15(a), Neology's counterclaims properly were amended. As to the breach of contract claim under the APA, Neology argues it sufficiently pleads the existence of a Material Adverse Effect under the APA definition, and the remedy of indemnification does not affect its breach of contract claim. Neology also contends 3M's maximum liability is not $300,000 because Neology alleges a violation of both APA Sections 10.2(a) and 10.2(b), for which 3M's maximum liability is the purchase price under the APA. As to the breach of contract claims under the Transition Agreements, Neology argues 3M contractually was obligated to maintain the RoHS 2 Exemption because 3M could

13

not properly provide the contracted-for services without maintaining the exemption. Next, Neology contends that if the breach of contract claim does not survive, Neology sufficiently pleads breach of the implied covenant in the alternative. Finally, as to the fraud claims, Neology argues the Non-Reliance Clause does not bar its claims, and further, Neology alleges 3M made material misrepresentations and concealed material facts *before* the APA was executed, which brings the claim outside any argument regarding bootstrapping.

## ANALYSIS

On a motion to dismiss, the Court must determine whether the "plaintiff 'may recover under any reasonably conceivable set of circumstances susceptible of proof.'"[26] "If [the plaintiff] may recover, the motion must be denied."[27] A court may grant the motion if "it appears to a reasonable certainty that under no state of facts which could be proved to support the claim asserted would plaintiff be entitled to relief."[28] When applying this standard, the Court will accept as true all

---

[26] *Holmes v. D'Elia*, 2015 WL 8480150, at *2 (Del. Dec. 8, 2015) (quoting *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[27] *Deuley v. DynCorp Int'l, Inc.*, 2010 WL 704895, at *3 (Del. Super. Feb. 26, 2010) (citing *Parlin v. DynCorp Int'l, Inc.*, 2009 WL 3636756, at *1 (Del. Super. Sept. 30, 2009) (quoting *Spence*, 396 A.2d at 968)), *aff'd*, 8 A.3d 1156 (Del. 2010).

[28] *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 724 (Del. 1960) (citing *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 315 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954)); *Nero v. Littleton*, 1998 WL 229526, at *3 (Del. Ch. Apr. 30, 1998).

14

non-conclusory, well-pleaded allegations.[29] In addition, "a trial court must draw all reasonable factual inferences in favor of the party opposing the motion."[30]

## I. Neology's counterclaims are not barred procedurally.

In its motion to dismiss, 3M first argues the Amended Counterclaim must be dismissed due to procedural deficiencies, namely Neology's failure to: (1) engage in pre-litigation dispute resolution procedures, (2) properly amend its counterclaim under Superior Court Civil Rule 15(a), and (3) timely provide notice to 3M of Neology's claims under the APA and the Distribution Agreement.

### A. The parties have waived the APA's dispute resolution procedures.

The APA contains a provision requiring the parties to engage in pre-litigation dispute resolution when any post-closing dispute arises.[31] Under Section 11.9, if a post-closing dispute arises, the parties must attempt to negotiate with one another, or, if negotiations are unsuccessful after thirty days, they must initiate non-binding mediation with a mutually-agreed upon mediator.[32] Neither party may initiate legal proceedings until forty-five days after appointment of a mediator.[33]

3M contends Neology failed to comply with Section 11.9's dispute resolution procedures before filing the Amended Counterclaims, and Neology's

---

[29] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).
[30] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (citing *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)) (other citations omitted)).
[31] APA § 11.9.
[32] *Id.* § 11.9(a)-(b).
[33] *Id.* § 11.9(c).

claims therefore must be dismissed.[34] In response, Neology argues any pre-litigation dispute resolution requirement has been met or cured because the parties mediated after Neology filed the Amended Counterclaims, and further, 3M waived its right to insist on mediation when it initiated this litigation without mediating its own claims. Although 3M maintains this argument "on principle," 3M acknowledged at oral argument that this point largely is moot due to post-filing events. I agree. Here, the parties' actions indicate they have waived strict compliance with the APA's dispute resolution procedures.[35] The parties mediated without success in February 2019 after the Amended Counterclaims were filed,[36] and according to Neology, 3M itself failed to comply with the APA's dispute resolution procedures before filing this action.[37] Accordingly, the APA's dispute resolution procedures have been waived for purposes of this dispute.

---

[34] See Fernstrum v. Trunzo, 2017 WL 6028871, at *4 (Del. Ch. Dec. 5, 2017).
[35] See Millsboro Fire Co. v. Construction Management Service, Inc., 2009 WL 846614, at *5 (Del. Super. Mar. 31, 2009) (finding the parties had waived the pre-litigation mediation requirement when neither requested mediation before filing suit and they had unsuccessfully mediated during the pendency of the action). See also Allied World Surplus Lines Insurance Company v. Blue Cross and Blue Shield of South Carolina, 2017 WL 3328230, at *2 (D.S.C. Aug. 3, 2017) (the parties had waived strict compliance with the requirement that AAA administer mediation when both parties voluntarily submitted to mediate before the judge).
[36] Neology's Answering Br. at 6.
[37] Am. Countercl. ¶ 22. See Delta and Pine Land Co. v. Monsanto Co., 2006 WL 1510417, *5 (Del. Ch. May 24, 2006) (finding that a party who actively has participated in litigation has waived its right to arbitration).

16

**B. A motion to dismiss is not a responsive pleading under Superior Court Civil Rule 15(a).**

Superior Court Civil Rule 15(a) provides, "[a] party may amend the party's pleading once as a matter of course at any time before *a responsive pleading* is served or . . . Otherwise, a party may amend the party's pleading *only by leave of court or by written consent of the adverse party . . .*"[38] 3M contends their original motion to dismiss is a "responsive pleading," and Neology's Amended Counterclaims therefore must be dismissed because the claims were filed without 3M's consent or leave from the Court.[39]

A motion to dismiss, however, is not a responsive pleading. This conclusion is consistent with the Court's rules, Delaware case law, and the notion of judicial efficiency.[40] Permitting one amendment as a matter of right in the face of a motion to dismiss encourages a plaintiff to address, if possible, any deficiencies in an initial complaint and proceed on its best set of allegations. If, even after

---

[38] Super. Ct. Civ. R. 15(a) (emphasis added).

[39] There is no Delaware Supreme Court case squarely addressing this issue. 3M cites *Prezant v. De Angelis* for its contention that a motion to dismiss is a responsive pleading. 636 A.2d 915, 919 (Del. 1994) ("The complaint was amended without leave of the court, pursuant to Chancery Rule 15(a), because, unlike the vigorously contested Illinois action in which defendants filed a motion to dismiss, defendants have never filed a responsive pleading in this action."). In a more recent case, however, the Delaware Supreme Court referred to a motion to dismiss and a responsive pleading as separate documents. *Gadow v. Parker*, 865 A.2d 515, 519 (Del. 2005) ("The Superior Court Civil Rules expressly permit a defendant to raise the defense of limitations in a motion to dismiss or in a first responsive pleading to the complaint.").

[40] *See Ward v. CareFusion Solutions, LLC*, 2018 WL 1320225, at *3 (Del. Super. Mar. 13, 2018) ("[A] motion to dismiss is not a responsive pleading that would require [Plaintiffs] to seek leave of the Court to file an amended Complaint."). *See also Gumbs v. Delaware Department of Labor*, 2015 WL 1542126, at *1 (Del. Super. Mar. 27, 2015); *Stoppel v. Henry*, 2011 WL 55911, at *3 (Del. Super. Jan. 4, 2011).

amendment, the complaint remains deficient, a defendant would have a strong argument to seek dismissal with prejudice. Accordingly, Neology was not required to seek 3M's consent or leave from the Court, and Neology's Amended Counterclaims properly were filed under Rule 15(a).

## C. Neology sufficiently pleads that it provided timely notice of a dispute under the Distribution Agreement and the APA.

Next, 3M argues Neology's breach of covenant claim under the APA and breach of contract claim under the Distribution Agreement both are untimely. According to Neology, however, it gave 3M timely notice of its claims, and regardless, timeliness is a question of fact not amenable to resolution on a motion to dismiss. Under Delaware law, parties to a contract may shorten the statute of limitations.[41] Both the APA and the Distribution Agreement expressly limit the time period for a party to bring a claim.

The limitations period in the APA prohibits any claim for breach of covenant brought twelve months after the closing date.[42] To preserve a claim, the complaining party must provide written notice of the claim within twelve months of closing, including descriptions of the nature of the claim and the estimated loss.[43] The closing date was June 30, 2017, therefore notice of any claim for

---

[41] *Woodward v. Farm Family Cas. Ins. Co.*, 796 A.2d 638, 642-43 (Del. 2002).
[42] APA § 10.1(a)(iii).
[43] *Id.* § 10.6(a).

18

breach of covenant was required by June 30, 2018.[44] Under Section 10.1(b), if notice is provided by June 30, 2018, the claim survives until it is "fully and finally resolved."

The Distribution Agreement expressly prohibits a claim brought more than two months after the agreement's termination or expiration unless the claim was timely noticed in writing and with the requisite specificity.[45] The Distribution Agreement was effective from June 1, 2017 to December 1, 2017, therefore notice of any breach of contract claim under the Distribution Agreement was required by February 1, 2018.[46]

In the Amended Counterclaims, Neology alleges that "3M had notice of Neology's claims against 3M, including Neology's claims under the [Distribution Agreement], prior to February 1, 2018, which 3M expressly acknowledged in writing several months before 3M filed suit against Neology in this Court."[47] Under Delaware's pleading standard this statement sufficiently pleads that Neology's claims are timely. Whether Neology ultimately can prove it timely gave notice with the specificity required under the Distribution Agreement and the APA is a question of fact the Court cannot resolve on the record before it.

---

[44] *Id.* § 2.4(a).
[45] Distribution Agreement § 4.1(a).
[46] *Id.* § 5.1.
[47] Am. Countercl. ¶ 46.

## II. Neology's Breach of Contract Claims

### A. Indemnification is the parties' exclusive remedy under the APA because the Exclusive Remedy Clause bars a breach of contract claim.

3M next argues Neology's breach of contract claim is not permitted under the APA because indemnification is Neology's exclusive remedy. In Count I of the Amended Counterclaims, Neology alleges 3M breached the APA by making inaccurate representations and warranties under APA Section 3.5 and by breaching the covenant in APA Section 5.1. Under the Exclusive Remedy Clause, however, indemnification is the parties' exclusive remedy for breach.[48] Each party agreed that neither would be liable for breach and waived "to the fullest extent permitted under applicable Law, any and all rights, *claims and causes of action* [] for any breach of any representation, warranty, covenant, agreement or obligation set forth [in the APA] or [] otherwise relating to the subject matter of [the APA]."[49] The Exclusive Remedy Clause is unequivocal. Each party waived their right to any claim for breach of the APA, and Neology's only remaining claim is for indemnification under Article 10. 3M's motion to dismiss Neology's breach of contract claim under the APA therefore is granted, and Neology's claims under Section 3.5 and 5.1 survive only as indemnification claims.

---

[48] APA § 10.8(a).
[49] *Id.* (emphasis added).

20

**B. 3M has conceded that Neology adequately pleads a breach of contract claim under the Distribution Agreement.**

In the Amended Counterclaims, Neology alleges 3M's sale of ALPR products at historically low gross profit margins breached Section 2.5(a) of the Distribution Agreement, which required 3M to "sell [p]roducts to, and accept or decline orders received from, [c]ustomers only [] in a manner consistent with its past practices . . . ." Other than attacking this claim procedurally, 3M does not contend Neology fails adequately to plead a claim for breach of the Distribution Agreement. Because the Court already concluded Neology's Distribution Agreement claim is not barred procedurally, 3M has conceded that Neology adequately pleads a breach of contract claim under the Distribution Agreement.[50]

**C. Neology does not adequately plead a breach of contract claim under the Service Agreement.**

3M next argues Neology's breach of contract claim under the Service Agreement fails as a matter of law. Under the Service Agreement, 3M was required to perform certain "Transition Services" for Neology to assist with the transition of the Business, and 3M was to use "substantially the same degree of care, skill, and diligence" it used when providing those services to its own organization.[51] Transition Services are defined as "the transition services listed in

---

[50] Although the claim survives, 3M's maximum liability for breach of contract is $500,000. Distribution Agreement § 4.1(a).
[51] Service Agreement § 2.4.

21

Appendix A."[52] Appendix A contains a Transition Services Schedule describing four specific Transition Services: Accounting and Finance Services, Information Technology Services, Supply Chain Services, and IT Systems Access Services.[53] Neither party was required to perform any service except those specified in the Transition Services Schedule.[54] Under the Service Agreement, 3M also was required to use good faith efforts to obtain all "Consents and Permits" necessary to properly perform these services.[55] 3M was not, however, required to perform the services "in a jurisdiction where a Permit [was] required . . . and [3M did not] hold such Permit . . . provided, that, [3M] used commercially reasonable efforts to retain or obtain any such Permit . . . ."[56]

The parties agree the RoHS 2 Exemption constitutes a "Permit" under the Service Agreement. The parties disagree, however, whether 3M contractually was obligated to maintain the RoHS 2 Exemption under the Service Agreement. 3M argues that obtaining regulatory approval to sell products in the European Union was not expressly listed in the Transition Services Schedule, and 3M therefore was not obligated to maintain the RoHS 2 Exemption. Neology acknowledges the RoHS 2 Exemption is not expressly listed in the Transition Services Schedule, but argues maintaining the permit contractually was required because the permit was

[52] *Id.* at 5.
[53] *Id.* App. A.
[54] *Id.* § 2.1.
[55] *Id.* § 6.14.
[56] *Id.* § 2.6(b).

22

necessary for 3M to provide "Supply Chain Services." Neology posits the RoHS 2 Exemption is encompassed in Supply Chain Services because the permit is necessary to get the product to market. Neology, however, does not point to any language in the Transition Services Schedule to support the conclusion that "Supply Chain Services" includes selling the Business's products.

Supply Chain Services includes procuring goods and services, package design, generating supply and demand plans, obtaining materials, product production support, and stock support.[57] Nothing in the description of Supply Chain Services appears to address the product's final sale, and Section 2.1 of the Service Agreement clearly states that the parties only contractually were obligated to perform services listed in the Transition Services Schedule. Because nothing within "Supply Chain Services" refers to getting the product "to market," the Court cannot reasonably infer from Neology's allegations that 3M contractually was required to maintain the RoHS 2 Exemption under the Service Agreement.[58] Accordingly, Count I as it relates to the Service Agreement is dismissed without prejudice to Neology filing a second amended counterclaim within twenty days.[59]

---

[57] *Id.* App. A at 11-12.

[58] This conclusion is bolstered by the fact that selling the products specifically is covered in the Manufacturing Agreement, as explained below.

[59] Even if Neology sufficiently can plead a claim under the Service Agreement, 3M's maximum liability for breach of contract is $600,000. Service Agreement § 4.1(a).

23

### D. Neology adequately pleads a breach of contract claim under the Manufacturing Agreement.

3M also argues Neology's breach of contract claim under the Manufacturing Agreement fails as a matter of law. The Manufacturing Agreement required 3M to provide "Contract Manufacturing Services" during the transition of the Business, and to use "substantially the same degree of care, skill, and diligence" 3M used when providing those services to its own organization.[60] The definition of Contract Manufacturing Services specifically includes "sell[ing] the [p]roducts . . . ." which, in the European Union, would require the RoHS 2 Exemption.[61]

3M argues it was not obligated to maintain the RoHS 2 Exemption, particularly because 3M was not required to provide Contract Manufacturing Services "in a jurisdiction where a Permit is required to perform such [services] and 3M does not hold such Permit . . . ."[62] 3M's argument, however, relies on a disputed fact the Court cannot resolve on a motion to dismiss. 3M contends it did not hold the RoHS 2 Exemption before closing. Neology, on the other hand, alleges 3M "previously obtained" the RoHS 2 Exemption and allowed it to expire.[63] Whether or not 3M held the permit at the time the parties entered into the Manufacturing Agreement may come to light during discovery, but the Court cannot make that determination on the current record. Accordingly, 3M's motion

---

[60] Manufacturing Agreement § 2.5(b).
[61] *Id.* § 2.1(b).
[62] *Id.* § 2.7(b).
[63] Am. Countercl. ¶¶ 17-18.

to dismiss Neology's breach of contract claim under the Manufacturing Agreement is denied.[64]

## III. Neology's implied covenant claim does not plead any contractual gap.

3M next argues Neology's implied covenant claim must be dismissed because the express terms of the contract govern the conduct at issue. In the Amended Counterclaims, Neology alleges 3M breached the implied covenant of good faith and fair dealing in the APA and Transition Agreements by "failing to disclose the actual status and market readiness of the New Fixed Camera to Neology, failing to renew the RoHS 2 exemption . . . and selling Neology's ALPR products below historical gross margins and COGS."[65] 3M argues Neology merely repeats the allegations supporting its breach of contract claim, which is insufficient to plead an implied covenant claim under Delaware law. In response, Neology maintains it has pleaded its implied covenant claim in the alternative, and "if the finder of fact determines there was no contractual breach, 3M's conduct amounts to a breach of the implied covenant."[66]

---

[64] Although the claim survives, 3M's maximum liability for breach of contract is the "aggregate amount paid by [Neology] to 3M pursuant to [the Manufacturing Agreement] as of the date of the performance or non-performance from which such [l]osses arose . . ." Manufacturing Agreement § 7.2(a).

[65] Am. Countercl. ¶¶ 72-73.

[66] Neology's Answering Br. at 25.

The implied covenant of good faith and fair dealing is a "limited and extraordinary legal remedy."[67] The Court only will imply contractual obligations when there are "developments or contractual gaps that . . . neither party anticipated."[68] To sufficiently plead breach of the implied covenant, the complaint "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[69] The Court will not retroactively "grant contractual protections that parties forwent at the bargaining table."[70] When the express terms of the contract address the conduct at issue, the implied covenant claim must be dismissed.[71] Simply mirroring the factual allegations that support a breach of contract claim is insufficient to state a claim for breach of the implied covenant of good faith and fair dealing.[72]

---

[67] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

[68] *Id.* at 1125.

[69] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[70] *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust for Heyman*, 2017 WL 1224506, at *7 (Del. Super. Mar. 30, 2017) (citing *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)).

[71] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015).

[72] *GWO Litigation Trust v. Sprint Solutions, Inc.*, 2018 WL 5309477, at *6 (Del. Super. Oct. 25, 2018) (citing *Cental Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 539 (Del. 2011) ("To maintain an implied covenant claim, the factual allegations underlying the implied covenant claim must differ from those underlying an accompanying breach-of-contract claim.")); *Haney v. Blackhawk Network Holdings, Inc.*, 2016 WL 769595, at *9 (Del. Ch. Feb. 26, 2016) ("Where a plaintiff has failed to identify a gap in the contract, merely repeating the defendant's allegedly improper acts or omissions already the subject of a separate breach of contract claim is insufficient to support a claim for breach of the implied covenant of good faith and fair dealing.").

Here, the APA and the Transition Agreements squarely address 3M's alleged failure to disclose the overheating issue with the New Fixed Camera, failure to retain the RoHS 2 Exemption, and the sale of ALPR Products below historical gross margins. The APA expressly defines a Material Adverse Effect and establishes the type of occurrence or development that must be disclosed to Neology before closing.[73] Further, the Transition Agreements set forth 3M's duties under those contracts and what services 3M agreed to provide.[74] 3M's conduct either was a breach of those obligations or it was not.

The Court rejects the argument that the implied covenant of good faith and fair dealing can be plead in the alternative under these circumstances. Neology cites *Renco Group, Inc. v. MacAndrews AMG Holdings LLC*,[75] but that case is inconsistent with other Delaware cases defining the pleading requirements of implied covenant claims.[76] Neology does not plead an unanticipated development or contractual gap; it simply realleges its breach of contract claim as an implied covenant claim. Because the express terms of the contracts govern the alleged conduct, Neology's claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

---

[73] APA at 8-9.

[74] *See, e.g.*, Service Agreement App. A; Distribution Agreement § 2.1; Manufacturing Agreement § 2.1.

[75] 2015 WL 394011, at *6-7 (Del. Ch. Jan. 29, 2015).

[76] *GWO Litigation Trust*, 2018 WL 5309477, at *5-7; *Edinburgh Holdings, Inc. v. Education Affiliates, Inc.*, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018); *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3-4 (Del. Super. June 27, 2016).

## IV. Neology adequately pleads a claim for indemnification.

3M next argues Neology's indemnification claim under the APA must be dismissed. Neology alleges it has suffered losses related to "(i) inaccuracies in representations and warranties that it made pursuant to Article 3 of the APA, and (ii) breach of covenants, agreements or obligations to be performed by 3M or any of its [a]ffiliates contained in or made pursuant to the APA," and therefore Neology should be indemnified in an amount "in excess of $5,958,700."[77] 3M argues the indemnification claim must be dismissed because 3M has not made an inaccurate representation or warranty. 3M also contends Neology's damages request exceeds the contractually-permitted recovery, and the Court should strike any damages request in excess of $300,000.

Neology bases its first indemnification claim on the Material Adverse Effect clause of APA Section 3.5, which states, "since [December 31, 2016] until [May 4, 2017] . . . there has not been any Material Adverse Effect." The APA defines a Material Adverse Effect as a condition that materially is adverse to "the business, condition (financial or otherwise), assets, liabilities, operations or results of operations of the Business, taken as a whole . . . ."[78] The definition of Material Adverse Effect expressly excludes the Business's failure to meet "estimates,

---

[77] Am. Countercl. ¶ 67.
[78] APA at 8.

28

expectations, budgets, projections or forecasts," but "the underlying causes of such failure may so constitute or be taken into account . . . ."[79]

Under Delaware law, "[a] buyer faces a heavy burden when it attempts to invoke a material adverse effect clause."[80] A material adverse effect generally is an unexpected event or series of events that threatens a business's overall earnings "in a durationally-significant manner."[81] A material adverse effect is not "[a] short-term hiccup in earnings." Rather, it is a material change when viewed through a reasonable acquirer's long-term perspective.[82] Whether a material adverse effect exists ultimately is a factual issue.[83]

3M argues Neology does not sufficiently plead the existence of a Material Adverse Effect because Neology relies on forward-looking financial statements, which the Non-Reliance Clause and the plain language of the definition of Material Adverse Effect disallow. Neology specifically acknowledged in the APA that it was not relying on "any representation, warranty or other statement. . . except for the representations and warranties expressly set forth in Article 3 . . .," and that 3M had not made any statements regarding "the operation or probable success or

---

[79] Id.

[80] Hexion Specialty Chemicals, Inc. v. Huntsman Corp., 965 A.2d 715, 738 (Del. Ch. 2008) (citing In re IBP, Inc. Shareholders Litigation, 789 A.2d 14, 68 (Del. Ch. 2001)).

[81] Id.

[82] Id.

[83] Akorn, Inc. v. Fresenius Kabi AG, 2018 WL 4719347, at *52 (Del. Ch. Oct. 1, 2018) ("Whether the party asserting the existence of an MAE has adduced sufficient evidence to carry its burden of proof is a question of fact."). See also ChyronHego Corp. v. Wight, 2018 WL 3642132, at *9 (Del. Ch. July 31, 2018).

29

profitability of the Business" and "the accuracy or completeness of any information" provided in contemplation of the transaction.[84] Additionally, the definition of Material Adverse Effect excludes "any failure by the Business to meet any internal or external estimates, expectations, budgets, projections or forecasts."[85]

The Court agrees that under the plain terms of the APA, Neology has waived its right to rely on the financial projections and therefore cannot utilize them to allege the existence of a Material Adverse Effect. Excluding the financial projections, however, and drawing all reasonable inferences from Neology's allegations, the Court concludes Neology sufficiently has pleaded there was a Material Adverse Effect that 3M failed to disclose to Neology before the sale. According to Neology, 3M knew there were serious and unresolved issues with the New Fixed Camera, which the parties anticipated would represent 100% of camera sales by 2019.[86] The Thermal Report indicated that previous attempts to fix the overheating issue had failed, and 3M had no plan in place for further development.[87] It is reasonable to infer from the Amended Counterclaims that 3M knew as early as March 2017 that an entire product line, which represented a substantial portion of the Business, was in jeopardy. Accordingly, Neology

---

[84] APA § 4.8.
[85] *Id.* at 8.
[86] Am. Countercl. ¶¶ 7-11.
[87] *Id.* ¶ 10.

30

adequately pleads there was a "development" that was "materially adverse" to the Business between December 31, 2016 and May 4, 2017, and 3M's representation to the contrary was inaccurate and misleading.

Neology's second claim for indemnification is based on the covenant in APA Section 5.1, which required 3M to operate the ALPR Business in its ordinary course before closing. Neology alleges 3M breached this covenant when it failed to maintain the RoHS 2 Exemption. Other than attack this claim as untimely, 3M does not contend Neology fails adequately to plead an indemnification claim for breach of covenant. Because the Court already has rejected 3M's timeliness argument in its present procedural posture, Neology's breach of covenant claim survives.

The Court also rejects 3M's request to strike the amount of damages in excess of $300,000. Neology's indemnification claim does not fall within that damages cap. According to Section 10.5(b) of the APA, 3M's maximum liability for a claim under Section 10.2(a) ("any inaccuracy in any representation or warranty of [3M] contained in Article 3") is $300,000, but 3M's maximum liability for a claim under Section 10.2(a) *and* Section 10.2(b) ("any breach of covenant, agreement, or obligation to be performed by [3M] or any of its [a]ffiliates contained in or made pursuant to [the APA]") *together* is the purchase price under

the APA.[88] Neology's indemnification claim includes underlying claims for an inaccurate representation and warranty in Section 3.5 *and* for breach of covenant. Accordingly, 3M's maximum liability is the purchase price under the APA.

**V. Neology adequately pleads a claim for fraud in the inducement and fraudulent concealment.**

In its final argument, 3M contends Neology's fraud claims are not sufficiently pleaded because the factual allegations supporting those claims are identical to Neology's breach of contract allegations. 3M also argues the APA's Non-Reliance Clause bars the fraud claims. In the Amended Counterclaims, Neology alleges 3M misrepresented in Section 3.5 of the APA that there had been no Material Adverse Effect, Neology justifiably relied on that representation, 3M knew the representation was false, and Neology fraudulently was induced into purchasing the Business. Neology further alleges 3M had a duty to inform Neology of the developments in the Thermal Report but failed to do so, and 3M concealed material facts related to the Business with the intent to deceive Neology and induce Neology into entering the APA. As a result of 3M's conduct, Neology claims it has suffered significant damages.

According to 3M, the bases for Neology's fraud claims are 3M's forward-looking statements and financial projections about the New Fixed Camera, which

---

[88] APA § 10.5(b) ("Notwithstanding anything in this [a]greement to the contrary, the maximum aggregate [l]iability of [3M] (i) under Section 10.2(a) shall be $300,000, and (ii) *under Section 10.2(a) and Section 10.2(b) together shall be the [p]urchase [p]rice*.") (emphasis added).

32

the Non-Reliance Clause in Section 4.8 expressly precludes. In the APA, Neology represented to 3M that it had not relied on "any representation, warranty or other statement made by, on behalf of or relating to [3M], [3M]'s [a]ffiliates or the Business," except for those in Article 3.[89] At oral argument, Neology conceded the clause precludes reliance on extracontractual representations, including the KPMG Report, the E&Y Report, and 3M's own financial statements. Citing *Novipax Holdings LLC v. Sealed Air Corporation*, Neology nevertheless maintains that the Non-Reliance Clause does not bar its fraud claims altogether.[90]

In *Novipax*, as in this case, indemnification was the parties' exclusive remedy for breach, but the contract contained a fraud carve-out stating "nothing [] shall limit [] any claim based on fraud, willful misrepresentation or willful breach . . ."[91] The contract also contained non-reliance and integration provisions.[92] The Court upheld the plaintiff's fraud claim, finding that, "the parties preserved a fraud claim in [the exclusive remedy clause], but limited that fraud claim *through* the non-reliance provisions . . . to written representations in the APA."[93]

Here, the APA clearly limits fraud claims to the written representations in the contract. Section 10.8(b) provides:

---

[89] *Id.* § 4.8(a).
[90] 2017 WL 5713307 (Del. Super. Nov. 28 2017).
[91] *Id.* at *5.
[92] *Id.* at *10-11.
[93] *Id.* at *12 (emphasis added).

33

> The parties agree that nothing in this Article 10, *but subject in all cases to the limitations in Section 4.8 and Section 11.3*, shall limit either [p]arty's right to bring a claim until the latest time permitted by applicable [l]aw based on the [f]raud of any other [p]erson against such [p]erson *in respect of any representation and warranty contained in Article 3 or Article 4 . . .*[94]

This provision unambiguously preserves a fraud claim, but confines that claim to the representations and warranties in Article 3 and Article 4 of the APA and excludes reliance on any extracontracual representations as required by the Non-Reliance Clause. Neology's fraud claims are permitted under the APA because they focus on an alleged misrepresentation in APA Section 3.5. To the extent, however, that Neology is relying on extracontractual representations to support its fraud claims, reliance on those representations is barred by the Non-Reliance Clause and the express language of Section 10.8(b).

3M also contends Neology's fraud claims impermissibly are "bootstrapped" to its breach of contract claim. Under Delaware law, a fraud claim may be based on contractual representations, but "where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."[95] The plaintiff may not "bootstrap a claim of breach of contract into a claim for fraud

---

[94] APA § 10.8(b) (emphasis added).
[95] *Aviation West Charters, LLC v. Freer*, 2015 WL 5138285, at *6 (Del. Super. July 2, 2015).

by alleging that a contracting party never intended to perform its obligations."[96] Merely adding the term "fraudulently induced" to the complaint is not sufficient. Instead, the plaintiff must base its fraud claim on "conduct that is separate and distinct from the conduct constituting breach."[97] Nevertheless, allegations specifically suggesting fraudulent *inducement* to contract are not barred.[98]

Here, Neology's fraud claims are not impermissibly bootstrapped to its contract claim. Neology specifically alleges the fraud occurred before the parties entered the APA, when 3M represented there was no Material Adverse Effect to the Business. Neology does not allege 3M failed to perform under the contract, rather, Neology makes a separate and distinct claim that 3M misrepresented and concealed a major product line's development issues in order to induce Neology into purchasing the Business. Further, Neology seeks rescissory damages, which are a remedy for fraud, not breach of contract.[99] Accordingly, Neology sufficiently pleads claims for fraudulent inducement and fraudulent concealment.

## CONCLUSION

For the foregoing reasons, 3M's Motion to Dismiss is **DENIED** as to Counts I (Breach of the Manufacturing Agreement and Distribution Agreement), II, III, and IV; is **GRANTED** without prejudice as to Count I (Breach of the Service

---

[96] *Novipax Holdings LLC*, 2017 WL 5713307, at *14.
[97] *Aviation West Charters, LLC*, 2015 WL 5138285, at *6.
[98] *Novipax Holdings LLC*, 2017 WL 5713307, at *14; *Aviation West Charters, LLC*, 2015 WL 5138285, at *6.
[99] *Novipax Holdings LLC*, 2017 WL 5713307, at *14.

Agreement); and is **GRANTED** with prejudice as to Counts I (Breach of the APA) and V. **IT IS SO ORDERED.**